# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| SHARNETTE D. BASS | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §    CIVIL ACTION NO. H-04-1652 |
| | § |
| ALEGIS GROUP, L.P. and SHERMAN | § |
| FINANCIAL GROUP, L.L.C., | § |
| | § |
| Defendants. | § |

## MEMORANDUM AND OPINION

Sharnette D. Bass sues her former employer, Alegis Group, L.P., alleging that Alegis terminated her employment because Bass exercised her right to obtain medical benefits under a plan covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1100 *et seq.* ("ERISA"). Bass also alleges that Alegis failed to pay some unpaid medical benefits for that surgery, in violation of 29 U.S.C. § 1132. Alegis moves for summary judgment on the grounds that Bass received all the medical benefits the ERISA plan covered; that Bass was not fired; and that there was no evidence of discrimination or retaliation based on the exercise of ERISA rights. Bass has responded to the summary judgment motion. Based on a careful review of the motion, the response, the parties' submissions, and the applicable law, this court grants Alegis's motion for summary judgment and by separate order enters final judgment. The reasons are set out below.

**I.      Background**

Bass began working with Alegis on February 24, 2003 as an at-will employee. She was paid an hourly wage and a portion of the delinquent amounts she collected. On June 1, 2003, Bass became eligible for medical benefits under the plan Alegis offered to employees, the Sherman Financial Group LLC Welfare Benefit Plan. It is undisputed that the Plan is covered by ERISA. Under the Plan, the insurer paid ninety percent of covered claims. (Docket Entry No. 20, Ex. 3, ¶ 3; Ex. 1, pp. 181–84). The medical bills were sent directly to the Plan administrator, not to Alegis. It is uncontroverted that Alegis did not see the bills, the claims, or the amounts paid. (*Id.*, Ex. 3, ¶ 4).

In July 2003, Bass learned that she needed a hysterectomy. She told her supervisor, Chris Brent, that she needed surgery and would take between four to six weeks off beginning on August 11, 2003. Bass also informed Monique LeFlore, the Alegis Human Resources Manager, of the forthcoming surgery and the need for time off. It is undisputed that Bass was ineligible for leave under the Family and Medical Leave Act (FMLA), (*Id.*, Ex. 1, pp. 90–91, 163), because she had not worked for one year. Under the Alegis policy, set out in its Employee Manual, employees ineligible for FMLA leave did not receive any other paid medical leave. (*Id.*, Ex. 3, ¶ 6). The Alegis Employee Manual explained that an employee who had worked for less than one year would receive a certain number of personal days off per year. It is undisputed that Brent approved Bass's request for three days' paid leave of absence for her surgery.

The parties do dispute Bass's status during and after the four-to-six-week unpaid

leave. Bass testified in her deposition that when her immediate supervisor, Brent, learned of the surgery and approved three days' paid leave, he also told Bass that she would be put on inactive status while she was out for four to six weeks without pay. That status would ensure that Brent would not be responsible for Bass's monthly budget while she was on unpaid leave. According to Bass, Brent told her that when she returned, her "position would still be there." Alegis agrees that Brent told Bass that she would be on inactive status, but denies that Brent promised that Bass would be guaranteed the same position when she was able to return to work. Bass agreed that Brent did not, however, make any statement about what would happen to her accounts or "book of business" during her absence. (Docket Entry No. 20, Ex. 1, pp. 98, 101–02). Bass also testified that LeFlore also told her she would be on inactive status during the unpaid leave and would still be considered an Alegis employee. (*Id.*, pp. 151–53, 118–20, 162). Bass also testified that Brent and LeFlore told her to apply for unemployment benefits to make up for the fact that she was not eligible for FMLA benefits. (*Id.*, p. 109).

Alegis agrees that Brent and LeFlore told Bass that she would be on inactive status, but dispute any guarantee as to the position she would have when she could return to work. (*Id.*, Ex. 2, p. 58). Alegis denies that LeFlore and Brent advised Bass to file a claim for unemployment benefits. It is undisputed that Bass filed a claim for unemployment benefits with the Texas Workforce Commission on August 10, 2003. The claim filed with the Commission includes a statement from Bass that she was "discharged after [she] was told that since [she] would be inactive they were letting [her] go." (*Id.*, Ex. 1, p. 108). Bass

denies making this statement to the TWC, but it is undisputed that it is on the unemployment benefits claim she filed.

It is undisputed that Bass had the surgery and received the three days' paid leave. It is undisputed that after her surgery, the ERISA Plan paid ninety percent of the medical bills. On August 27, 2005, Bass's doctor issued her a work release that allowed her to return on September 15, 2003. At some point, Bass provided this statement to Alegis. On August 31, 2003, Bass received notification that her medical coverage had been terminated because she was no longer an Alegis employee. She went to Alegis on September 11, 2003 and talked to LeFlore and Brent. Bass alleges that they explained that Alegis had terminated her job "by mistake." (*Id.*, Ex. 1, pp. 124, 132). The computerized personnel records show that this occurred on August 13, 2003, when her paid leave days expired. LeFlore testified that Alegis's information technology department automatically shows an employee on inactive status as "terminated" unless a communication is sent stating that the employee will return to work. (*Id.*, pp. 35–36). LeFlore testified that although she had sent an email information technology explaining that despite her inactive status, Bass should not be shown as "terminated," the email apparently had not been followed.[1] Bass testified that LeFlore told

---

[1] LeFlore sent an email to information technology that said: "Subject Sharnette Bass. Letty, don't terminate her. Went out on medical leave for four to six weeks, but she returned all equipment." (Docket Entry No. 20, Ex. 2, p. 40). Bass complains that this email was not produced in discovery. (Docket Entry No. 28, p. 5). Bass did not ask for a continuance under Rule 56(f) and did not raise this issue until after discovery had closed. LeFlore's failure to produce the email does not preclude summary judgment. *See In re Carney*, 258 F.3d 415, 422 (5th Cir. 2001) (affirming grant of summary judgment when discovery request by party was not filed pursuant to a Rule 56(f) motion).

her that she would "fix" the mistake and talked to Brent. After talking to Brent, LeFlore told Bass that her job had been filled and that she would need to reapply. Brent told Bass that a "dialer" collector position was open. Alegis disputes that Bass was told that she would have to reapply, but it is undisputed that Bass was promised a collector position in the same department she had left and that a "dialer" position was open. Bass asserts that this would pay less than the prior position and would not have medical benefits for a period of ninety days. Bass did not ask Brent or LeFlore about her eligibility for benefits or what her pay rate would be. It is undisputed that Bass refused the offer of a "dialer" position and walked out, assuring Brent and LeFlore that they would "see [her] attorney." (Docket Entry No. 20, Ex. 1, pp. 128–34).

Bass alleges that her job was terminated because Alegis "found out that her medical expenses [for her hysterectomy] were too high." (*Id.*, p. 174). Alegis asserts that it did not intend to terminate Bass's employment; that she was supposed to remain on inactive status; and that when Alegis learned of the mistake, it told Bass that she would be able to return to work as a collector, although not necessarily at the same position she had before. Alegis has moved for summary judgment on the ground that the record does not support an inference that Bass's job termination was the result of discrimination or retaliation for the ERISA medical benefits she received or that she was owed any further benefits.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under Rule

56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics*

*Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

### III.   Analysis

ERISA prohibits an employer from terminating or discriminating against an employee for exercising the right to obtain plan benefits or to interfere with the employee's right to do so. Section 510 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

29 U.S.C. § 1140. "To establish a *prima facie* case of discrimination under ERISA, a plaintiff must establish that his employer fired him in retaliation for exercising an ERISA right or to prevent attainment of benefits to which he would have become entitled under an employee benefit plan." *Holztclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 260 (5th Cir.

2001). Specific discriminatory intent is an essential element of plaintiff's retaliation claim. *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 761 (5th Cir. 1996). A plaintiff "need not prove that the discriminatory reason was the only reason for the discharge but he must show that the loss of benefits was more than an incidental loss from his discharge, and this inference of discrimination can be prove[d] by circumstantial evidence." *Id.* Specific intent must be proven with positive evidence; speculation and conclusory allegations will not suffice. *See Stafford v. True Temper Sports*, 123 F.3d 291, 295–96 (5th Cir. 1997).

Although there are disputed fact issues as to what Bass was told when she told Brent and LeFlore about the surgery, these disputes are not material to determining whether there was an ERISA violation as alleged. The record precludes any inference that Alegis terminated Bass's employment or "demoted" her in order to prevent her from receiving ERISA benefits or to retaliate against her for having received ERISA benefits.

As to the first basis of a violation of section 510, it is undisputed that Bass received payment for ninety percent of the medical expenses that resulted from her surgery and that this was the full amount of the benefits to which she was entitled for the surgery. There is no allegation or evidence that Bass or Alegis expected that she would have significant ongoing medical problems or incur significant ongoing medical expenses. There is no evidence of any intent to prevent Bass from receiving benefits in the future. *See Matthews v. Trilogy Commc'ns*, 143 F.3d 1160, 1167 (8th Cir. 1998) (employee treated for diabetes-related medical expenses and terminated shortly thereafter did not support inference of discriminatory motive when employer did not know the plaintiff had diabetes and "had no

reason to believe [plaintiff] would incur substantial diabetes-related medical expenses in the future"); *cf. Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927–28 (5th Cir. 1999) (plaintiff argued that his employer fired him partially "to avoid paying any future claims" after he had a heart attack and open heart surgery; plaintiff showed that this claim was the costliest health condition among employees that year and that the employer would likely face additional claims up to $25,000).

Because there is no evidence as to any likely future claims by Bass, the issue is whether there is a basis to infer that Alegis terminated her employment with the specific intent of retaliating against her for having the surgery that resulted in the payment of ERISA benefits. Bass's only evidence that the termination was motivated by retaliation is the short time between her surgery and her job termination. (Docket Entry No. 28, p. 10). An inference of retaliation may arise when termination occurs shortly after an employee claims medical benefits. *See, e.g.*, *Nero*, 167 F.3d at 927. Such an inference is not required, however; timing must be considered in light of other factors. *See, e.g.*, *Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001) (in Title VII case, "suspicious timing" was considered in context of "other significant evidence of pretext"); *Matthews*, 143 F.3d at 1167 (evidence as to employee who was terminated two months after submitting his $15,000 medical claim did not support inference of a retaliatory motive because employer "had no reason to believe that [the employee] would incur substantial . . . medical expenses in the future" and because other employees had submitted higher claims against the plan and retained their employment); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir.

1989) (plaintiff's "use of benefits immediately prior to his termination" did not raise inference of discriminatory motive by employer because plaintiff had used benefits before). No such inference arises under the circumstances of this case.

Bass argues that Alegis terminated her employment because her medical expenses were "too high." The uncontroverted evidence in the record is that Alegis did not know the amount of benefits Bass received. Leslie Hayes, Alegis's Vice-President of Human Resources, stated in an affidavit that no one at Alegis received information on how much the Plan paid for medical claims, including Bass's. (Docket Entry No. 20, Ex. 3, ¶ 4). LeFlore, the Human Resources Manager, testified that she did not know the costs of Bass's procedure. (Docket Entry No. 20, Ex. 2, pp. 140–41). Bass, in her deposition, testified that no one at Alegis commented on the cost of her medical claims. "As a matter of fact, they acted like everything was fine." (Docket Entry No. 20, Ex. 1, p. 184).

Competent and uncontroverted evidence in the record also shows that other employees have claimed Plan benefits and continued their employment with Alegis. (Docket Entry No. 20, Ex. 3, ¶ 5). *See Matthews*, 143 F.3d at 1167 (evidence that other employees had submitted claims without termination weighed against finding inference of discriminatory motive by employer).

Taking the evidence in the light most favorable to Bass does not avoid summary judgment. The Alegis witnesses and Bass gave consistent testimony that Bass was supposed

to be on "inactive" status after the surgery and would not be paid while she was off work.[2] On Alegis's internal computerized record, however, Bass's employment was shown as "terminated" when her paid days off expired. When Bass told LeFlore that she had been "terminated" rather than placed on "inactive" status, LeFlore and Brent told Bass that it had been a mistake and that she would be able to return to work at Alegis. There is no evidence that Alegis specifically intended to fire Bass in order to retaliate against her for having received benefits under an ERISA Plan. In *Nero*, by contrast, the plaintiff submitted evidence that his health condition was the costliest among his fellow employees that year and that his employer stated the reason for termination as "poor job" performance, despite favorable performance reviews, the absence of any documentation showing counseling for poor performance, and the lack of any warning before his job termination. *Id.* at 923. In the present case, Alegis did not offer Bass pretextual reasons for her termination. When Bass pointed out that Alegis's records showed her as terminated rather than inactive, she was offered a job. Bass has not raised a genuine issue of material fact as to whether Alegis had a specific discriminatory intent to retaliate against her for exercising or interfere with right or benefit to which she was entitled under ERISA. Alegis is entitled to judgment as a matter of law.

---

[2] The evidence that Bass filed for unemployment benefits and told the Texas Workforce Commission that she had been terminated from her job before the surgery is inconsistent with Bass's own argument that she was promised that she was still an Alegis employee during her surgery and unpaid time off for recovery. Bass denies making the statement shown on the unemployment benefits claim she filed. On summary judgment, this court resolves conflicts in favor of the nonmovant. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005).

Bass's second cause of action is for the recovery of benefits due her under the Plan The statute provides:

A civil action may be brought–

(1) by a participant or beneficiary–

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132. The record shows that Alegis paid ninety percent of Bass's medical claims, the amount covered by the Plan. During her deposition, Bass could not identify any medical claims that she submitted during her employment that were not paid by Alegis's insurance carrier. (Docket Entry No. 20, Ex. 1, p. 186). She claimed that the Plan paid only ninety percent and should have paid one hundred percent. (*Id.*, pp. 195–96). Under the Plan terms, however, the insurance company pays ninety percent of all network claims after deductibles and copayments. (Docket Entry No. 20, Ex. 3, ¶ 3). Bass does not raise a disputed fact issue material to determining that Alegis wrongly denied her any Plan benefits to which she was entitled.

Bass admits that she never sought review of any denied medical claims for reconsideration and payment. (Docket Entry No. 20, Ex. 1, p. 196). Participants in employee benefit plans must exhaust their administrative remedies under the plans before filing suit in federal court to recover benefits due under the plans. *See, e.g.*, *Bourgeois v.*

*Pension Plan for Employees of Santa Fe Int'l Corp.*, 215 F.3d 475, 479 (5th Cir. 2000); *Denton v. First Nat'l Bank*, 765 F.2d 1295, 1300–03 (5th Cir. 1985). Exhaustion of internal plan remedies is not required when an employee alleges a violation of a statutory provision of ERISA, as contrasted with a claim for benefits due under an employee benefit plan. *See, e.g.*, *Chailland v. Brown & Root, Inc.*, 45 F.3d 947, 950–51 (5th Cir. 1995); *Milofsky v. Am. Airlines, Inc.*, 404 F.3d 338, 352–53 (5th Cir. 2005). Bass's claim of retaliation would not require exhaustion of administrative remedies, but Bass should have sought review of her denied claims under the Plan's administrative procedures before filing a claim for recovery of unpaid benefits. Because this court finds that Bass received all of the benefits to which she is entitled under the Alegis's plan, this issue is moot.

**IV.   Conclusion**

This court grants Alegis Group's motion for summary judgment. By separate order, this court enters final judgment for Alegis.

SIGNED on December 12, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge